# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MICHELLE CONAGE,

      Plaintiff,

v.                                                                          Case No. 3:19-cv-87-J-32JRK

WEB.COM GROUP, INC.,

      Defendant.

_____

## O R D E R

Michelle Conage brings this case against her past employer Web.com Group, Inc. alleging violations of the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"). Conage's complaint alleges that Web.com interfered with her use of FMLA leave and constructively discharged her for taking FMLA leave. (Doc. 1). Web.com filed a motion for summary judgment (Doc. 28) claiming that Web.com approved all the leave that Conage requested and thus did not interfere with Conage's right to take leave under FMLA. Web.com also asserts that it did not retaliate against Conage. Id. Conage filed a response to the motion, and the parties presented their arguments at the November 23, 2020 telephone hearing, the record of which is incorporated by reference. (Docs. 33–35).

I.    BACKGROUND

A.    General Details of Conage's Employment

In September 2014, Conage began her employment as a full-time customer support specialist in the Customer Care Department of a Web.com call center in Florida. (Docs. 28-2; 28-1 at 127). Conage received an hourly wage and was eligible for performance-based bonuses each pay period ("paycheck bonuses") and a Christmas bonus. (Docs. 28-1 at 155; 28-10 at 76, 92). The paycheck bonuses provided employees with an opportunity to earn $300 to $350 extra per pay period. (Doc. 28-1 at 155). In the Customer Care Department, these bonuses were based on the number of customer reviews submitted for an employee, an employee's quality assurance scores ("QA scores") and attendance. (Doc. 28-1 at 155–56). To determine the QA scores, Web.com's QA team, as well as supervisors and managers, reviewed two calls per week for each employee to score the employee's compliance with standardized call procedures. (Doc. 28-1 at 158–60).

Around March 2015, Joshua Allen, Conage's manager from September 2015 through January 2016, transferred Conage from her customer support specialist role to a more demanding customer support role in Web.com's Retention Department. (Docs. 1 at ¶ 9; 28-10 at 63, 77). This was not an extraordinary decision. All customer service specialists spent time in the Retention Department. (Docs. 28 at 7; 28-10 at 62). Additionally, in accepting

her position at Web.com, Conage signed an offer letter stipulating that "'[Web.com] reserve[d] the right to change [her] position, work location, reporting structure, work duties, and the company's general employment policies and procedures . . . at its discretion.'"(Docs. 28-2; 28-1 at 127–28).

Conage did not have experience with customer retention work and conveyed to Allen that she was not comfortable switching departments. (Doc. 28-1 at 169). Conage contends that Allen promised her that he would transfer her back to the Customer Care Department if the Retention Department became "too uncomfortable" or "too much." Id.; (Doc. 33-1 at ¶ 7). Allen testified that he never made such a promise. (Doc. 28-10 at 64). In the Retention Department, Conage was also eligible for paycheck bonuses, which were based on employees' QA scores and attendance, the number of customer reviews submitted for employees, and the number of customer accounts that employees saved. (Doc. 28-1 at 156).

In Fall 2015, before Conage's first application for FMLA leave, Conage asked Allen to transfer her back to the Customer Service Department. (Doc. 28-1 at 171, 175). She was under significant stress due, in large part, to issues outside of work. Id. Allen denied her request. (Docs. 28-10 at 63–64; 28-1 at 175–76).

Conage was generally a good employee. (Doc. 33-1 at 6). However, Conage was written up/disciplined at least once before she applied for FMLA leave. (Doc. 28-1 at 131).

### B.    Web.com FMLA Leave Procedures

Under FMLA, if certain conditions are met, employees are guaranteed a maximum of twelve weeks of unpaid leave during any twelve-month period. See 29 U.S.C. § 2612(a)(1)(C). One condition for leave eligibility is that an employee must have worked for a covered employer for at least one year and for 1250 hours during the twelve months prior to the leave start-date. 29 C.F.R. § 825.110(d). Thus, employees have a limited entitlement to FMLA leave. Upon regaining eligibility, employees are able to reapply for leave. See, e.g., (Doc. 28-8 at 59–60).

Under Web.com guidelines, managers were directed to refer employees requesting information about FMLA leave to Web.com's human resources department ("HR"). (Docs. 28-2 at 20; 28-10 at 16). Web.com did not authorize managers to make decisions about leave. (Docs. 28-10 at 15–16; 28-9 at 17–19). Following a manager's referral, the HR team would typically help employees complete their leave applications and submit the applications to Liberty Mutual—a third-party FMLA leave administrator. (Docs. 28-8 at 9; 28-9 at 17–19). Liberty Mutual ultimately determined whether to approve or deny leave requests, not HR. (Docs. 28-8 at 30; 28-9 at 17–19, 27–28). HR did, nonetheless,

4

preliminarily assess whether employees met certain basic leave requirements, such as whether they had been employed at Web.com for a year and whether they had worked 1250 hours. (Doc. 28-9 at 18).

### C.    Conage's First Application for FMLA Leave

On October 20, 2015,[1] Conage asked Allen about taking FMLA leave to care for Luther Mobley, who suffered from a serious illness and issues stemming from surgical interventions. (Docs. 33-1 at ¶ 8; 28-1 at 15; 28-10 at 16). Conage testified that she told Allen that Mobley was the only father whom she'd known. (Doc. 28-1 at 178). Although Mobley was not Conage's biological parent or legal guardian (i.e., he never adopted Conage), Mobley financially supported Conage when she was a minor. (Doc. 28-1 at 15, 118).[2]

Conage contends that Allen denied her leave request on October 28, 2015, and that HR affirmed Allen's decision, expressing that Conage did not qualify for FMLA leave because Mobley was not her biological father. (Doc. 28-1 at 151–52). Neither HR nor Allen provided Conage with leave paperwork following her leave request. (Doc. 33-1 at ¶ 10).

---

[1] The Plaintiff's Response & Opposition to Defendant's Motion for Summary Judgment provides conflicting dates. In some paragraphs, the response states that Conage requested FMLA on October 20, 2015, while in others, it states that Conage requested FMLA on October 25, 2015. (Doc. 33 at 5, 20).

[2] Web.com did not contest that Mobley could be considered Conage's "parent" for FMLA purposes. Thus, the Court need not decide the issue.

Later, on October 28, 2015, Conage contacted Liberty Mutual directly to apply for FMLA leave. (Doc. 28-1 at 179–80). Although this was not standard practice, Web.com permitted employees to apply for FMLA leave in this manner. (Docs. 28-8 at 27–28; 28-9 at 33). Liberty Mutual immediately granted Conage's request, approving Conage to take up to five days of intermittent leave per month between October 29, 2015 and October 28, 2016 for Mobley's medical treatments. (Docs. 33-1 at ¶ 12; 28-7 at 60; 28-1 at 179–80).

Approximately a week after Conage's leave was approved, Allen sent Conage two emails expressing that: "[p]re-scheduled [doctor's] appointments [did] not excuse [Conage] from a whole day of work," Conage was "expected to come in and work the remainder of [her] shift before or after [Mobley's] pre-scheduled appointments," Conage should send a list of times for pre-scheduled appointments in advance of the appointments, and Conage was "expected to schedule [Mobley's] appointments as early in the day as possible" when she worked closing shifts. (Doc. 28-5 at 59–60). Conage submits that HR concurred with Allen's statements. (Docs. 28-5 at 59–60; 28-8 at 37–38). However, after Conage reported to Liberty Mutual that Web.com was placing inappropriate restrictions on her use of FMLA leave, HR allegedly instructed Allen that Conage was permitted to be absent five full days per month, and he would have to accommodate her. (Doc. 28-1 at 148–49).

Within two months of being approved for leave, Web.com docked Conage's Christmas bonus by greater than fifty percent, (Doc. 33 at 7), one of her superiors accused her of manipulating Web.com's system to inflate her compensation, (Docs. 28-1 at 48–53; 28-5 at 58), and services performed by Conage were repeatedly miscoded for payroll causing Web.com to underpay Conage, (Doc. 28-5 at 54).

In December 2015, Conage communicated these issues to senior management, stating that she was being retaliated against for taking FMLA leave. Id. at 52–58. That same month, senior management resolved Conage's compensation issues and gave Conage a full Christmas bonus. Id. at 52–53. Moreover, senior management assured Conage that she would be transferred back to the Customer Service Department in a matter of weeks. Id.; (Doc. 28-1 at 174–75). Furthermore, Web.com did not reprimand Conage for allegedly inflating her compensation. (Doc. 28-1 at 48–52).

## D.     Recertification, January – February 2016

In January 2016, Conage exceeded the number of FMLA leave days that she was permitted to take per month, taking six leave days rather than five. (Doc. 28-7 at 58). In response, Liberty Mutual requested that Conage submit an updated certification from Mobley's healthcare provider indicating the frequency of leave required for Mobley's care. (Doc. 28-7 at 58, 124–30). It is unclear what became of this request.

In February 2016, Conage was given a warning for making an unprofessional comment as she exited a staff meeting. (Docs. 28-7 at 127; 28-1 at 224–26). Conage also complained to HR that Web.com was not properly compensating her for the extra work her manager was requiring her to do. (Doc. 28-5 at 49). HR provided an immediate response, notifying Conage that employees in her role were not due additional pay under Web.com's new compensation plan. Id. at 48.

**E.    Continuous Leave and Intermittent Leave Frequency Increased, March – May 2016**

In March 2016, Conage applied to take additional FMLA leave. (Docs. 28-7 at 35, 44; 28 at 5). Liberty Mutual approved Conage's application, which permitted her to take continuous leave from April 1 to April 10, 2016. (Docs. 28-7 at 35, 44; 28 at 5). Subsequently, Conage filed an updated certification from Mobley's healthcare provider estimating that Conage needed seven days of intermittent leave per month to care for Mobley. (Doc. 28-7 at 26). Accordingly, Liberty Mutual approved Conage to take up to seven days of intermittent leave per month between April 20, 2016 and October 1, 2016. (Docs. 28-7 at 26; 28 at 5).

On May 23, 2016, Conage notified Web.com that she had not received credit for over three thousand dollars in upsells. (Doc. 28-5 at 44, 46). Web.com

expressed that they'd look into it and follow up with her. Id. Web.com did not follow up before May ended.

### F.     Period of FMLA Ineligibility, August – October 2016

On August 30, 2016, Conage reached maximum entitlement for her leave. (Doc. 28-7 at 25). She had to wait until she regained eligibility to reapply.

In September and October 2016—months in which Conage was not eligible for FMLA leave—Conage emailed her superiors, claiming that unjustified amounts were being deducted from her paycheck bonuses and that she had to dispute at least three inaccurate QA scores to receive pay that she was due. (Docs. 28-5 at 42–45; 28-7 at 25). She also inquired about being assigned a new QA coach. (Doc. 28-5 at 44).

### G.     Conage's Resignation, November 2016 – January 2017

In November 2016, Conage filed a leave request directly with Liberty Mutual to take intermittent leave between November 3, 2016 and November 2, 2017. (Docs. 28-7 at 13, 94; 28 at 5). Because Conage did not meet with HR to file her leave application, HR did not submit required employer certifications to Liberty Mutual. (Docs. 28-7 at 10; 33-1 at ¶¶ 21–22). However, before November ended, Conage was approved to take up to seven intermittent leave days per month between November 2, 2016 and November 1, 2017. (Docs. 28-7 at 5, 13; 28 at 5).

On December 29, 2016, Conage again maxed out her leave entitlement. (Doc. 28-7 at 1). Conage did not realize this until January 5, 2017, after she had missed work on December 30, 2016 and January 4 and 5, 2017. (Doc. 28-5 at 14–15). Liberty Mutual granted Conage a one-time exception for the days she missed on January 4 and 5, 2017 to be counted as FMLA leave days. Id.; (Docs. 28 at 5; 28-8 at 60).

As for Conage's workplace conditions, Conage's complaints concerning inaccurate QA scores continued through November and December of 2016. (Docs. 28-7 at 5; 28-5 at 21–31). In addition, Web.com issued Conage a written warning for violating Web.com's attendance policy on January 16, 2017. (Doc. 28-6). Three days later, Conage submitted a resignation letter, stating that she had been treated unfairly as a result of taking FMLA leave and that, due to the mistreatment, she felt that her health was in jeopardy if she remained employed at Web.com. (Doc. 28-5 at 13).

Conage's testimony was that Web.com resolved all material issues relating to her performance-based compensation (i.e., the paycheck bonuses) in her favor before her departure. She testified that:

- "Any time anything was taken from me . . . and I was able to prove that it was incorrect, [Web.com would] fix it and give me my money," id. at 168;

- "I can't tell you today that they took something from me and they owe me for that, no," id. at 169;

- "[Web.com] did try to repay me when I brought [my grievances] to upper management's attention . . . ." Id.

After departing Web.com, Conage enrolled in school to become a merchant mariner. (Doc. 28-1 at 58). She did not apply for unemployment benefits. Id.

## H.    Incidents Occurring at Unspecified Times

According to Conage, after requesting FMLA leave, one of her supervisors did not speak to her socially, despite speaking to all other employees. (Doc. 28-1 at 233–34). After Conage reported her supervisor's conduct to HR, her supervisor spoke to her regularly. Id. On some days, a different supervisor required Conage to write down every account that she worked on. Id. at 204–213. This was a deviation from standard Web.com practice, and the supervisor did not require any other employees to write down every account that they worked on. Id.

## II.   DISCUSSION[3]

"[T]he FMLA entitles eligible employees to take up to twelve weeks of leave in one year for various specified reasons, including the 'serious health condition' of [an] employee's parent." Diamond v. Hospice of Florida Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017) (citing 29 U.S.C. § 2612(a)(1)(C)). "[A]fter the completion of FMLA qualified leave, eligible employees have the right 'to be restored by the employer to the position held by the employee when the leave commenced' or to 'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" Aponte v. Brown & Brown of Fla., Inc., 382 F. Supp. 3d 1318, 1325 (M.D. Fla. 2019) (citing 29 U.S.C. § 2614(a)(1)). To preserve these rights, the FMLA created two types of claims:

> interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the FMLA and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the FMLA.

---

[3] Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Estate of Todashev by Shibly v. United States, 815 F. App'x 446, 450 (11th Cir. 2020) (citing Fed. R. Civ. P. 56(a)). Once the movant "demonstrat[es] the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine issue for trial." Johnson v. Unique Vacations, Inc., 498 F. App'x 892, 895 (11th Cir. 2012). The Court views the evidence in the light most favorable to the non-moving party. See Shibly, 815 F. App'x at 450.

Marx v. Baker Cty. Med. Servs., Inc., No. 3:16-cv-462-J-32MCR, 2018 WL 4215950, at *6 (M.D. Fla. Sept. 5, 2018) (internal citations omitted). Here, Conage has brought both an interference claim and a retaliation claim against Web.com.

## I.   FMLA Interference

To state a claim of interference with a substantive right under the FMLA, an employee must demonstrate by a preponderance of the evidence that they were entitled to the benefit denied by their employer.[4] See Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206–07 (11th Cir. 2001); see also Diamond, 677 F. App'x at 592 ("[U]nlawful employer interference includes . . . 'discouraging an employee from [taking] leave.'"); Hill v. Branch Banking & Trust Co., 264 F. Supp. 3d 1247, 1264 (N.D. Ala. 2017) ("Pressure to reduce leave time interferes with an employee's FMLA rights."). In addition to showing interference, the employee must point to evidence that they were prejudiced as a result of their employer's FMLA violation. See Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 849 (11th Cir. 2009); Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).

> That means that a plaintiff must demonstrate some harm remediable by either damages or equitable relief, the two distinct categories of remedies provided for by

---

[4] "The FMLA makes it unlawful for employers 'to interfere with, restrain, or deny the exercise of or the attempt to exercise, any [FMLA] right . . . .'" Diamond, 677 F. App'x at 592.

> the FMLA. Damages can include not only wages, salary, employment benefits, or other compensation denied or lost to [an] employee by reason of the violation, but also, in cases where those forms of compensation have not been denied or lost, any actual monetary losses sustained by the employee as a direct result of the violation. Equitable relief can include "employment, reinstatement, and promotion.

Diamond, 677 F. App'x at 592–93 (internal citations and quotation marks omitted); see also Jones v. Children's Hosp., 58 F. Supp. 3d 656, 669 (E.D. La. 2014) ("Prejudice exists when an employee loses compensation or benefits by reason of [an employer's violation of the FMLA] [or] sustains other monetary losses . . . .").[5]

Based on the record, a jury could reasonably conclude that Web.com discouraged Conage from taking FMLA leave. (Docs. 33 at 11; 33-1 at ¶¶ 13–18). Nevertheless, Conage, has not articulated that she suffered any prejudice or recoverable damages from Web.com's interference with her FMLA leave. For instance, she has not claimed that by discouraging her from taking leave, Web.com caused her to incur expenses to transport Mobley to medical appointments or expenses for home care services for Mobley. To the contrary, Conage testified that Web.com never prevented her from attending any of

---

[5] "The FMLA expressly limits the forms of recovery to actual damages, liquidated damages, equitable relief, and fees and costs, and does not provide any recovery for mental or emotional distress." Frizzell v. Delta Air Lines, Inc., No. 1:19-CV-1573-TWT-JSA, 2019 WL 5459074, at *9 (N.D. Ga. Aug. 29, 2019) (citing 29 U.S.C. § 2617(a)).

Mobley's doctor's visits, and Liberty Mutual ultimately approved all the leave that Conage requested. (Doc. 28-1 at 183–84, 188). Thus, a jury could not reasonably conclude that Conage was prejudiced by Web.com's interference, and Web.com is entitled to summary judgment on Conage's interference claim. Cf. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1275 (11th Cir. 1999) ("[A] plaintiff suffers no FMLA injury when [they] receive[] all the leave [they] request[] . . . ."); Juback v. Michaels Stores, Inc., 143 F. Supp. 1195, 1211 (M.D. Fla. 2015) (granting summary judgment where "[e]ven if [the plaintiff] could show that he was entitled to FMLA leave and did not receive notice of its availability from [his employer], the undisputed facts demonstrate[d] that [the plaintiff] received all the medical leave he requested."); see also Mays v. Bd. of Comm'rs Port of New Orleans, No. 14-1014, 2015 WL 6605545, at *15 (E.D. La. Oct. 29, 2015) ("Even if a reasonable jury could find that [the defendants] at first unreasonably denied [the plaintiff] her FMLA leave rights, [the plaintiff] must still point to evidence that she lost compensation or benefits by reason of the violation, sustained other monetary losses as a direct result of the violation, or suffered some loss in employment status such that equitable relief is appropriate.").

### J.   FMLA Retaliation

"[T]o succeed on a retaliation claim, an employee must demonstrate that [their] employer intentionally discriminated against [them] in the form of an

adverse employment action for having exercised an FMLA right." <u>Strickland</u>, 239 F.3d at 1207. The employee also has the "burden of showing that [their] employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" <u>Id.</u> In the absence of direct evidence of the employer's intent, courts in the Eleventh Circuit apply the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), burden-shifting framework. <u>Strickland</u>, 239 F.3d at 1207; <u>see also</u> <u>Marx</u>, 2018 WL 4215950 at *6. "If the employee successfully demonstrates a <u>prima facie</u> case of FMLA retaliation, the burden then shifts to the employer to articulate a legitimate reason for the adverse action." <u>Guasch v. Carnival Corp.</u>, 723 F. App'x 954, 957 (11th Cir. 2018). "Once an employer articulates a legitimate non-discriminatory reason, the employee then must show that the employer's proffered reason was pretextual." <u>Id.</u>

Conage must establish a <u>prima facie</u> case under the <u>McDonnell</u> framework because she has not presented direct evidence of retaliation. To satisfy this burden, Conage must show that: "(1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." <u>Strickland</u>, 239 F.3d at 1207 (citing <u>Parris v. Miami Herald Publ'g Co.</u>, 216 F.3d 1298, 1301 (11th Cir. 2000)). While Conage has sufficiently shown that her leave to care for Mobley was protected under FMLA, she has not demonstrated that she suffered an adverse employment action for which she may recover damages.

16

"[A]ctions that affect compensation are considered adverse employment actions." <u>Gillis v. Ga. Dep't of Corrs.</u>, 400 F.3d 883, 887 (11th Cir. 2005) (concluding that an employer's denial of a raise was an adverse employment action); <u>see, e.g.</u>, <u>Porterfield v. Saul</u>, No. 2:17-cv-0939-JEO, 2019 WL 6701974, at *6 (N.D. Ala. Dec. 9, 2019) (determining that low performance ratings affecting an employee's compensation can be adverse employment decisions). Here, in the light most favorable to Conage, the record supports that, during her tenure at Web.com, she was faced with inaccurate QA scores, docked paychecks, a docked Christmas bonus, micromanagement, disciplinary warnings and reprimands, and unfriendly behavior from her superiors. (Doc. 33 at 17–19). Conage also contends that she was adversely impacted by a delayed transfer from the Retention Department to the Customer Service Department. <u>Id.</u> Many of these actions impacted Conage's compensation. However, the adverse impacts on Conage's compensation were temporary and ultimately rectified by Web.com—albeit not as quickly as Conage desired. Conage testified that, if she could show that her compensation was incorrect, Web.com would remedy any discrepancies and pay her the full amount that she earned. (Doc. 28-1 at 168–69). She also testified "I can't tell you today that [Web.com] took something from me and they owe me for that . . . ." (Doc. 28-1 at 168–69). <u>See</u> <u>Demers</u>, 321 F. App'x at 849 (A plaintiff "may not recover for technical infractions under the FMLA . . . in the absence of damages.") (internal quotation

marks omitted). Therefore, Conage's retaliation claim is contingent on whether she created an issue of fact that Web.com constructively discharged her, which in turn, would support that Conage is owed lost wages or front pay. Indeed, constructive discharge is the core focus of Web.com's motion for summary judgment and Conage's response to the motion. (Doc. 33 at 7–8).

To establish a claim of constructive discharge, a plaintiff must produce evidence that their "working conditions were 'so intolerable that a reasonable person in [their] position would have been compelled to resign.'" Sutherland v. Glob. Equip. Co., 789 Fed. App'x 156, 160 (11th Cir. 2019) (internal citations omitted); see also Maddin v. GTE of Fla., Inc., 33 F. Supp. 2d 1027, 133 (M.D. Fla. 1999) ("'To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'"); Freeman v. Koch Foods of Ala., 777 F. Supp. 2d 1264, 1287, 1292 (M.D. Ala. 2011) ("[E]ven if [the plaintiff] had established claims for failure to promote/transfer, unequal pay, and retaliation, [the plaintiff] has failed to establish that her working conditions were so intolerable that a reasonable person would have felt compelled to resign."). "Courts do not consider the Plaintiff's subjective feelings." Bozeman v. Per-Se Tech., Inc., 456 F. Supp. 2d 1282, 1355 (N.D. Ga. 2006). In addition, "a genuine voluntary resignation cannot support a constructive discharge claim." Gonzalez v. PNC Bank, N.A., No. 6:17-cv-543-Orl-40DCI, 2018 WL 4924341, at *6 (M.D.

18

Fla. Oct. 10, 2018) (holding that "[a]lthough [the] [plaintiff paint[ed] a picture of an unpleasant work environment," the plaintiff voluntarily resigned).

Although Conage had poor relationships with several of her superiors and arguably was faced with a challenging work environment (e.g., having to repeatedly contest her bonus pay and QA scores and experiencing ostracization), the record does not reflect that she suffered from work conditions so intolerable that she would have been compelled to resign. Web.com eventually resolved Conage's primary complaints concerning her Christmas bonus, paycheck bonuses, and transfer to the Retention Department in her favor. (Docs. 28 at 12; 28-1 at 52-53, 168–69, 174–75). Thus, as a matter of law, Conage's retaliation claim fails. Cf. Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 978 (11th Cir. 2003) (affirming the district court's grant of summary judgment based on a determination that "[a] withdrawn reprimand could [not] amount to an 'intolerable' working condition."); Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) (affirming the district court's grant of summary judgment based on a finding that "[r]epeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job."); see also Boze v. Branstetter, 912 F.2d 801, 804–06 (5th Cir. 1990) (holding that unwarranted criticism, poor performance evaluation, probation and

withdrawal of responsibilities did not constitute a constructive discharge as a matter of law).[6]

Accordingly, it is hereby

**ORDERED:**

1. Web.com Group, Inc.'s Dispositive Motion for Summary Judgment (Doc. 28) is **GRANTED**.

2. The Clerk shall enter judgment in favor of Defendant Web.com Group, Inc. and against Plaintiff Michelle Conage.

3. Once judgment has been entered, the Clerk shall terminate all deadlines and pending motions, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 16th day of December, 2020.



TIMOTHY J. CORRIGAN
United States District Judge

tn
Copies:
Counsel of record

---

[6] Even assuming _arguendo_ that Plaintiff met her initial burden of proving a _prima facie_ case of FMLA retaliation, Plaintiff has not produced sufficient evidence to show that Defendant's nondiscriminatory rationale for the actions at issue were pretextual.